## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

|  |  |
|---|---|
| In re:<br><br>Pure Prairie Poultry, Inc. f/k/a Pure Prairie Farms, Inc.,<br><br>     Debtor.[1] | Bankruptcy No. 24-01098<br><br>Involuntary Chapter 7<br><br>**MOTION FOR ORDER DISMISSING CASE UNDER 11 U.S.C. §§ 305(a)(1) AND 707(a), OR, IN THE ALTERNATIVE, GRANTING RELIEF FROM THE AUTOMATIC STAY AND REQUEST FOR TELEPHONIC HEARING** |

To:     The Debtor, Tri-State Poultry, LLC, Ekelr, LLC, Lee Frie, Larry Falk, and other parties in interest.

1.     Community Bank & Trust ("Community Bank"), the senior secured creditor of Pure Prairie Poultry, Inc., formerly known as Pure Prairie Farms, Inc. (the "Debtor"), hereby moves the Court for an order dismissing this involuntary Chapter 7 bankruptcy case under 11 U.S.C. §§ 305(a)(1) and 707(a), or, in the alternative, granting relief from the automatic stay under 11 U.S.C. § 362(d). Under Local Rule 9074-1, Community Bank requests that any hearing on this Motion be held telephonically.

2.     This Motion should be granted because, among other things: (a) as acknowledged by the Debtor in its previous bankruptcy case filed earlier this Fall, there are no assets available for distribution to unsecured creditors; (b) an assignment for the benefit of creditors was already commenced in Nicollet County, Minnesota after dismissal of the prior bankruptcy case and before

---

[1] In accordance with Fed. R. Bankr. P. 2002(n) and 1005, as applicable, the Debtor's address is 68808 Ford Road, Fairfax, Minnesota 55332 and its Employer Identification Number (EIN) is 84-2185133.

the filing of the involuntary petition here; and (c) the Debtor is a "farmer" within the meaning of 11 U.S.C. § 101(20) and, therefore, relief under 11 U.S.C. § 303 is not permitted.

3.      In support of this Motion, Community Bank respectfully states as follows:

## BACKGROUND

4.      On November 7, 2024, Tri-State Poultry, LLC, Ekelr, LLC, Lee Frie, and Larry Falk (collectively, the "Petitioning Creditors") filed this involuntary bankruptcy case against the Debtor. (ECF No. 1.) The petition is pending but no order for relief has been entered.

## I.      THE DEBTOR'S PRIOR OPERATIONS.

5.      The Debtor is a Minnesota corporation with a principal executive office of 68808 Fort Road, Fairfax, MN 55332-5533. (Decl. of George Peichel in Supp. of Chapter 11 Pet. and First Day Mots. (the "First Peichel Decl."), *In re Pure Prairie Poultry, Inc.*, No. 24-32426 (Bankr. D. Minn. Sept. 20, 2024), ECF No. 6, ¶ 6.)[2]

6.      The Debtor is a poultry producer and operated a poultry production plant located at 901 North Main, Charles City, Iowa 50616 (the "Plant"). (*Id.* ¶ 7.) The Debtor purchased the Plant on or around December 17, 2021 from Simply Essentials, LLC. *See, e.g.*, Suppl. Report of Sale, *In re Simply Essentials, LLC,* Case No. 20-00305 (Bankr. N.D. Iowa Dec. 28, 2021), ECF No. 263 (summarizing sale process).

7.      The Debtor purchases pullet chicks from a breeding stock company and contracts for the care and feeding of the chicks at one of four locations until they are 20 weeks old. (Decl. of George Peichel ("Second Peichel Decl.") ¶ 4(b), Ex. A; First Peichel Decl. ¶ 7.) The Debtor

---

[2] To the extent Community Bank cites to public records throughout this Motion, Community Bank requests that the Court take judicial notice of such records and the facts contained therein. *See* Fed. R. Evid. 201; Fed. R. Bankr. P. 9017 (incorporating the Federal Rules of Evidence).

pays for the use of the facilities and for all labor, feed, vaccines, and utility costs related to the raising of the chicks. (Second Peichel Decl. ¶ 4(b), Ex. A.)

8.      After 20 weeks, the pullet chicks are transferred to breeder barns where they become laying hens and lay eggs for hatching into broiler chicks. (*Id.* ¶ 4(c), Ex. B.) The Debtor contracts with the breeder barns to provide care of the birds and pick and box the eggs. (*Id.*) At all times, the Debtor owns the hens and pays for the use of the facilities and all labor, feed, vaccines, and utility costs related to the raising of the birds. (*Id.*) The birds law eggs for about 45 weeks. (*Id.*)

9.      The eggs laid at the breeder barns are taken to a custom hatchery to be incubated and hatched. (*Id.* ¶ 4(d), Ex. C.) At all times, the Debtor owns the eggs and pays a custom hatch charge. (*Id.*)

10.      Chicks from the broiler hatchery are taken to barns to be raised for six weeks. (*Id.* ¶ 4(e), Ex. D.) At all times, the Debtor owns the birds and pays for the use of the facilities and all labor, feed, vaccines, and utility costs related to the raising of the birds. (*Id.*)

11.      After six weeks, the Debtor picks up the birds and delivers them to the processing plan. (*Id.* ¶ 4(f).) The processed poultry products sold are whole chickens or chicken parts packaged in retail tray packs or in boxes for sale to food service. (*Id.*)

12.      In 2023, approximately 100% of the Debtor's gross revenue was derived from poultry operations. (*Id.* ¶ 5, Ex. E.)

13.      In 2024, approximately 100% of the Debtor's gross revenue was derived from poultry operations until the Debtor ceased operations. (*Id.* ¶ 6, Ex. F.)

## II.    THE RELATIONSHIP BETWEEN COMMUNITY BANK AND THE DEBTOR.

14.    Community Bank facilitated a loan to the Debtor under the Food Supply Chain Guaranteed Loan Program administered by the United States Department of Agriculture (the "USDA"). (Mot. for Interim and Final Orders (I) Granting Expedited Hr'g, (II) Approving Postpetition Financing, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Authorizing Use of Cash Collateral, (V) Granting Adequate Protection, (VI) Modifying Automatic Stay, and (VII) Granting Related Relief, *In re Pure Prairie Poultry, Inc.*, No. 24-32426 (Bankr. D. Minn. Sept. 20, 2024), ECF No. 13, ¶ 18  ("DIP Financing Motion").)

15.    The Debtor and Community Bank executed the Food Supply Chain Guaranteed Loan on April 26, 2023 (the "FSC Loan"). (*Id.*) The FSC Loan is guaranteed by the USDA up to 90%. (*Id.*)

16.    The Debtor used the FSC Loan to refurbish the Plant and purchase equipment. (First Peichel Decl. ¶ 9, 17, 22.)

17.    The FSC Loan is secured by the Debtor's main asset—the real estate where the Plant and supporting facilities are located—as well as the equipment located at the Plant (collectively, the "Community Bank Collateral"). (DIP Financing Mot. ¶ 18, Ex. D.)

18.    Community Bank's total claim against the Debtor is approximately $36 million. (*Id.*) The value of the Community Bank Collateral is insufficient to secure Community Bank's full claim. (*Id.* Ex. F.)

## III.    THE DEBTOR'S ADDITIONAL DEBT OBLIGATIONS.

19.    In addition to the debt owed to Community Bank, the Debtor also owes Bremer Bank ("Bremer") approximately $8,356,074.  (First Peichel Decl. ¶ 17.) To secure repayment of the amounts owed to Bremer, the Debtor executed a commercial Security Agreement granting

Bremer a first priority lien and security interest on certain of the Debtor's assets. (*Id.*) Bremer subsequently assigned its loans, claims against the Debtor, and security interest to Michael Helgeson. (Decl. of Alex Dybsky (the "Dybsky Decl.") ¶ 5.)

20.     Michael Helgeson is the Chairman of the Debtor's Board of Directors. (First Peichel Decl. ¶ 20.) In addition to Bremer's assignment of claims, Mr. Helgeson separately provided purchase money financing to assist the Debtor with purchasing the Plant. (*Id.*) To secure repayment of the financing, the Debtor granted Mr. Helgeson a mortgage in the Plant. (*Id.*) Mr. Helgeson executed subordination agreements with Community Bank, agreeing to subordinate his right to payment under his mortgage to Community Bank's right to payment under its mortgage. (*Id.*) As of the date of the filing of the Debtor's first bankruptcy case, the Debtor owed Mr. Helgeson $17,104,236.04. (*Id.*)

21.     The Debtor additionally owes: (a) approximately $1,547,741 to First Corporate Solutions pursuant to a Factoring and Security Agreement; (b) approximately $1,133,926 to Henkel Construction Company and Waldinger Corporation, which is secured by mechanics liens that are subordinated to Community Bank's mortgage; (c) approximately $145,792.59 to Ford Motor Credit Company LLC under several purchase money equipment finance facilities secured by a security interest in certain vehicles; and (d) approximately $95,744.40 to Union Bank & Trust under several purchase money equipment finance facilities secured by a security interest in certain vehicles. (First Peichel Decl. ¶¶ 18–19, 23–24.)

22.     Centra Sota Cooperative, Gold Eagle Cooperative, Premier Cooperative, and First Cooperative Association (collectively, the "Agricultural Suppliers") supplied the Debtor with feed on credit that was used to feed the Debtor's chickens. (*Id.* ¶ 27.) The Agricultural Suppliers assert agricultural liens upon all livestock that consumed the feed as well as the proceeds from such sales

under Iowa Code § 570A.3. (First Peichel Decl. ¶ 27.) The Debtor collectively owes the Agricultural Suppliers approximately $2,689,494.07. (*Id.*)

23.     The Debtor also owes approximately $3.5 million to creditors asserting secured interests that the Debtor disputes—Family Funding Group, LLC, Dynasty Capital 26, LLC, ACE Funding Source LLC, and Liquidity Access LLC. (*Id.* ¶¶ 29–34.)

24.     In total, the Debtor owes approximately $51,679,194.10 in undisputed secured debt and approximately $3,500,000 in disputed secured debt, for a total of up to $55,179,195.10 in secured debt obligations.

25.     The Debtor also owes at least $58 million in unsecured debt. (Dybsky Decl. ¶ 6.)

26.     Between the asserted secured debt obligations and the unsecured debt, the Debtor owes approximately $113,179,195.10 in total outstanding obligations.

## IV.     THE DEBTOR'S PRIOR CHAPTER 11 BANKRUPTCY FILING.

27.     On September 20, 2024, the Debtor commenced a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota. (Voluntary Pet., *In re Pure Prairie Poultry, Inc.*, No. 24-32426 (Bankr. D. Minn. Sept. 20, 2024), ECF No. 1 (the "Chapter 11 Petition").)

28.     In the Chapter 11 Petition, the Debtor identified Tri-State Poultry as one of the Debtor's top 20 largest unsecured creditors. (Chapter 11 Petition 7.) The Debtor also identified the Petitioning Creditors as creditors of the Debtor and listed them in the creditor matrix included with the Chapter 11 Petition and other filings. (*Id.* 23, 26, 30, 100.)

29.     On September 25, 2024, the Debtor filed an emergency motion seeking to dismiss the case. (Mot. Seeking Emergency Order Dismissing the Debtor's Chapter 11 Case, *In re Pure Prairie Poultry, Inc.*, No. 24-32426 (Bankr. D. Minn. Sept. 25, 2024), ECF No. 59 (the "Motion

to Dismiss").) As the basis for the Motion to Dismiss, the Debtor conceded that it: (a) lacked

sufficient cash collections to pay ongoing expenses and would incur $10,800,000 in negative cash

flow during the first six weeks of the case; (b) could not obtain post-petition financing on terms

acceptable to its secured lenders; and (c) experienced production disruptions and vendor delays

causing negative impacts to the Debtor's operations. (*Id.* ¶¶ 14–16.)  Ultimately, the Debtor

determined that it "lacks the resources or cash to continue operations while seeking restructuring

and rehabilitation through the Chapter 11 bankruptcy process" and "dismissal of this case is

necessary as a result." (*Id.* ¶¶ 17–18.)

30.     The bankruptcy court held a hearing on the Motion to Dismiss on September 27,

2024. (*See generally* Docket, *In re Pure Prairie Poultry, Inc.*, No. 24-32426 (Bankr. D. Minn.).)

Notably, none of the Petitioning Creditors appeared at the hearing on the Motion to Dismiss. (*Id.*)

31.     At the hearing, counsel for the Office of the United States Trustee ("U.S. Trustee")

acknowledged that there appeared to be no equity in the assets for unsecured creditors, a Chapter

7 trustee was likely to abandon the assets, and therefore the U.S. Trustee did not oppose the Motion

to Dismiss. No other parties in interest objected to the dismissal, including the Petitioning

Creditors here. (*See generally* Docket, *In re Pure Prairie Poultry, Inc.*, No. 24-32426 (Bankr. D.

Minn.).)

32.     On September 27, 2024, the bankruptcy court dismissed the Debtor's bankruptcy

case.  (Order, *In re Pure Prairie, Inc.*, No. 20-32426 (Bankr. D. Minn. Sept. 27, 2024), ECF No.

63.)

## III.     THE ASSIGNMENT FOR THE BENEFIT OF CREDITORS.

33.     On October 21, 2024, following discussions with Community Bank, the Debtor

made an assignment for the benefit of creditors pursuant to Chapter 577 of the Minnesota Statutes

and a general receivership was established pursuant to Chapter 576 of the Minnesota Statutes in the Fifth Judicial District in Nicollet County, Minnesota. (*See* Assignment for the Benefit of Creditors, *Pure Prairie Poultry, Inc. v. Lighthouse Mgmt. Grp., Inc.*, No. 52-CV-24-714, (Dist. Minn. Oct. 21, 2024), Index # 1 (the "Assignment").)[3]  The purpose of the Assignment is to protect the Debtor's assets for the benefit of creditors and to facilitate an expeditious sale of the Debtor's assets to a buyer so that the Plant can be reopened and secured creditors can realize on their collateral.

34.    As part of the Assignment, the Debtor assigned its assets to Lighthouse Management Group, Inc. (the "Assignee"). (*Id.*)

35.    Of the approximately $58 million that the Debtor owes in unsecured debt, it is believed that approximately $1.74 million is subject to the Packers and Stockyard Act ("PASA Trust"), which would have a superior interest in the Assignee estate. (Dybsky Decl. ¶ 7.)  The Assignee has had conversations with the USDA to ascertain the amounts due pursuant to the PASA Trust and had begun making arrangements to ensure any and all accounts receivable first pay the PASA Trust. (*Id.* ¶ 7.)

36.    Minnesota law provides for a stay of "the commencement or continuation of a judicial, administrative, or other action or proceeding, including the issuance or use of process, against the [Debtor] or the [Assignee] that was or could have been commenced before the time of appointment, or to recover a claim against the [Debtor] that arose before the time of appointment."

---

[3] A true and correct copy of the Assignment is attached as **Exhibit A**.

Minn. Stat. § 577.18 (making Minn. Stat. § 576.42 applicable to assignments for benefits of creditors).[4]

37.    Prior to the Assignment and since the commencement of the Assignment proceedings, the Debtor and the Assignee were pursuing a process for sale of the assets of the Debtor in an orderly process. (Dybsky Decl. ¶ 8.) The Debtor or the Assignee contacted over 36 companies as part of a potential sale. (*Id.*) As of the date of this Motion, the expressions of interest received by the Assignee from potential buyers range between $10 million and $11 million dollars. (*Id.*) These proposals fall significantly below the appraised forced liquidation value of $18 million and Community Bank's claim of approximately $36 million. (DIP Financing Mot. ¶ 18, Ex. F.)

38.    On or around November 2, 2024, the Assignee received an Asset Purchase Agreement executed by a third party for the purchase of the Debtor's assets for a total price of $10.5 million. (Dybsky Decl. ¶ 9.)  Around the same time, the Assignee received a second Asset Purchase Agreement from a separate third party for the purchase of the Debtor's assets for a total price of $10 million. (*Id.*)

39.    As of the date of the Assignment, the Debtor had ceased operations and terminated the majority of its employees, retaining a limited number of employees necessary to protect and preserve the existing assets. (*Id.* ¶ 3.)

40.    There are ongoing expenses to maintain the assigned assets in a secure manner and pay for the expenses of the Assignment process. Community Bank has agreed with the Assignee to fund the ongoing expenses of the Assignment, including for payment of utilities, insurance, and

---

[4] Community Bank is not the Assignee and thus cannot waive any claims that the Assignee may hold pursuant to Minnesota law. Nevertheless, out of an abundance of caution, Community Bank expressly reserves any right for Community Bank or the Assignee to pursue any and all claims against the Petitioning Creditors for violation of the stay under Minn. Stat. § 576.42 and nothing contained herein shall constitute a waiver of any such claim or argument.

the security of the Plant pursuant to a negotiated budget with the Assignee. (*Id.* ¶ 4.) The Debtor

or a Chapter 7 trustee if an order for relief is entered here will have no funds to pay these expenses

absent Community Bank's agreement to make protective advances. (*Id.*) In the next month, the

Assignee expects to incur at least $300,000 in expenses, excluding insurance,[5] necessary to

preserve the assigned assets. (*Id.*)

41.     Any delay of the sale process risks significant diminution of value of the collateral

due to: (a) the Plant's susceptibility to cold weather issues, including freezing pipes, electrical

issues, and vulnerable equipment parts; (b) the fact that there are currently 120,000 chickens laying

eggs that are sold to other chicken processors pursuant to a separate contract, which enhances the

value of the business, but the contract expires on November 30, 2024;[6] and (c) an extended sale

process, with the uncertainty caused by two competing court processes, will likely chill the sale

process. (*Id.* ¶ 11.)

## **RELIEF REQUESTED**

42.     Community Bank seeks an order dismissing this involuntary case pursuant to 11

U.S.C. §§ 305(a)(1) and 707(a).

43.     In the alternative, Community Bank seeks relief from the automatic stay under 11

U.S.C. § 362 to proceed with a foreclosure against the Community Bank Collateral by way of

continuance of the Assignment.

---

[5] Shortly before the filing of the involuntary Chapter 7 bankruptcy petition, Community Bank was in the process of obtaining a new insurance policy which would likely add at least an additional $500,000 in premium expenses and which would also be due in the next month. (Dybsky Decl. ¶ 4.)

[6] In addition to its impact on the value of the Debtor's business, the contract provides the livelihood to at least 13 farmers as well as others providing support services, such as veterinarians and transportation.

**BASIS FOR RELIEF REQUESTED**

**I.    CAUSE EXISTS FOR DISMISSAL UNDER SECTIONS 305(a)(1) AND 707(a) OF THE BANKRUPTCY CODE.**

44.    Section 305(a)(1) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to "dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if – the interests of creditors and the debtor would be better served by such dismissal . . ." 11 U.S.C. § 305(a)(1).

45.    Courts analyzing 11 U.S.C. § 305(a)(1) generally agree that abstention is an extraordinary remedy to be used only in extraordinary circumstances. *In re Pallet Reefer Co.*, 233 B.R. 687, 694 (Bankr. E.D. La. 1999).  However, courts will dismiss a case under 11 U.S.C. § 305(a)(1) after a finding that a dismissal better serves both creditors and debtors. *Eastman v. Eastman* (*In re Eastman*), 188 B.R. 621, 624–25 (B.A.P. 9th Cir. 1995) (quoting the legislative history which included the following example of when abstention is appropriate—"an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment") (quoting H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 325 (1977)).

46.    When making such a finding, courts employ a totality of the circumstances test and examine a number of factors, including the following:

(1) the economy and efficiency of administration;

(2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3) whether federal proceedings are necessary to reach a just and equitable solution;

(4) whether there is an alternative means of achieving an equitable distribution of assets;

(5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

(6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

(7) the purpose for which bankruptcy jurisdiction has been sought.

*In re Texas EMC Mgmt., LLC*, No. 11-40008-H3-7, 2012 WL 627844, at *3 (Bankr. S.D. Tex. Feb. 24, 2012); *In re Monitor Single Lift I, Ltd.*, 381 BR 455, 464–65 (Bankr. S.D.N.Y. 2008).

47.     Similarly, under 11 U.S.C. § 707(a), a bankruptcy court may dismiss a case for cause, including:

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees or charges required under chapter 123 of title 28; and

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

11 U.S.C. § 707(a). However, the three types of "cause" contained in 11 U.S.C. § 707(a) are nonexclusive. *Huckfeldt v. Huckfeldt* (*In re Huckfeldt*), 39 F.3d 829, 831 (8th Cir. 1994).

48.     To determine "cause," bankruptcy courts must conduct a fact-specific inquiry. *Auslander v. Murray* (*In re Murray*), 900 F.3d 53, 60 (2d Cir. 2018). Courts have considered the purpose of the petition and whether state proceedings adequately protect the parties' interests. *CTC 9th Ave. P'ship v. Norton Co.* (*In re C-TC 9th Ave. P'Ship*), 113 F.3d 1304, 1310–11 (2d Cir. 1997). Courts have also weighed whether a dismissal will prejudice creditors, focusing on whether assets would be lost as a result of a dismissal. *Sicherman v. Cohara* (*In re Cohara*), 324 B.R. 24, 27–28 (B.A.P. 6th Cir. 2005).  In an involuntary case, if an involuntary petition fails to satisfy the

requirements of 11 U.S.C. § 303, cause exists to dismiss. *See generally In re Murray*, 900 F.3d at 60.

49.    Here, cause exists to dismiss this case under both 11 U.S.C. §§ 305(a)(1) and 707(a).

**A.    The Petitioning Creditors Cannot Satisfy the Section 303 Requirements.**

50.    When a petitioning creditor cannot satisfy the requirements of 11 U.S.C. § 303, cause exists to dismiss the involuntary proceeding under 11 U.S.C. § 305(a)(1). *See generally In re Murray*, 900 F.3d at 60. Similarly, if a debtor is ineligible to "be a debtor" in a case, cause exists for a dismissal under 11 U.S.C. § 707(a). *In re LaPorta*, 332 B.R. 879, 883–84 (Bankr. D. Minn. 2005) ("A lack of statutory eligibility to 'be a debtor,' if it goes to a default on the part of the debtor that is incapable of cure under the very terms of the Code, is the very most fundamental 'cause' for dismissal.").

51.    Here, because the Debtor is a "farmer," under 11 U.S.C. § 101(20), the Bankruptcy Code precludes the commencement of an involuntary Chapter 7 bankruptcy case against the Debtor.

52.    Section 303(a) of the Bankruptcy Code permits the commencement of an involuntary case "only under chapter 7 or 11 of this title, and only against a person, <u>except a farmer</u>, family farmer, or a corporation that is not a moneyed, business, or commercial corporation, that may be a debtor under the chapter under which such case is commenced." 11 U.S.C. § 303(a) (emphasis added).

53.    The Bankruptcy Code defines "farmer" as a:

person that received more than 80 percent of such person's gross income during the taxable year of such person immediately preceding the taxable year of such person during which the case under this title concerning such person was commenced from a farming operation owned or operated by such person.

13

11 U.S.C. § 101(20).

54.   The Bankruptcy Code further defines "person" as including an "individual, partnership, and corporation." 11 U.S.C. § 101(41).

55.   The Bankruptcy Code defines "farming operation" as including "tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(21).

56.   The legislative history of the relevant provisions of the Bankruptcy Code indicates that the definitions of "farmer" and "farming operation" are to be liberally construed. *See In re Maike*, 77 B.R. 832, 835 (Bankr. D. Kan. 1987).

57.   Here, the Debtor's operations involve solely the production and raising of poultry. The Debtor contracts with hatcheries who supply chicks for ultimate processing into poultry products. (First Peichel Decl. ¶ 7.) The Debtor delivers these chicks to local growers—farmers who raise chickens to maturity for processing. (*Id.*) From the time the chicks hatch until they are sold as poultry products, the Debtor is the owner and controls the flow of production. (*Id.*)

58.   Consistent with the statutory definitions, courts recognize that operations like those conducted by the Debtor are "farming operations" within the meaning of the Bankruptcy Code. *See Coop. Supply, Inc. v. Corn-Pro Nonstock Coop., Inc.* (*In re Corn-Pro Nonstock Coop., Inc.*), 318 B.R. 153, 157 (B.A.P. 8th Cir. 2004) (holding that debtor conducted "farming operations" by owning livestock and hiring third-party producers to birth, raise, and finish the livestock); *In re Blanton Smith Corp.,* 7 B.R. 410, 413 (Bankr. M.D. Tenn. 1980) (finding that the debtor's entire gross income was derived from the processing, packaging, and marketing of eggs because the debtor owned the laying birds, managed the food, supplies, and medication for the birds, and collected and marketed the eggs produced); *see also In re Dakota Lay'd Eggs*, 57 B.R. 648, 656

14

(Bankr. D.N.D. 1986) (determining that income generated by flocks owned by the debtor but managed by third parties constituted income from "farming operations," but excluding income generated by eggs purchased from third parties).

59.     Here, as in *CornPro*, *Blanton*, and *Dakota Lay'd Eggs*, the Debtor contracts with growers to provide services, but the birds are owned by the Debtor and the Debtor pays for all feed, medicine, and all other elements of their care. Accordingly, the Debtor constitutes a "farmer" under 11 U.S.C. § 101(20).

60.     As the Debtor is a "farmer," the Bankruptcy Code explicitly precludes the Petitioning Creditors from commencing an involuntary proceeding against the Debtor and provides cause for the dismissal of this case pursuant to both 11 U.S.C. §§ 305(a)(1) and 707(a).

**B.     The Assignment for Benefit of Creditors Adequately Protects the Parties' Interests.**

61.     After dismissal of the Debtor's initial bankruptcy case, the Debtor consented to the Assignment and subsequently filed the Assignment with the Fifth Judicial District in Nicollet County, Minnesota (the "State Court"). After the Assignment, the Debtor ceased operations, no longer employs the majority of its employees, and lacks sufficient resources to fund operations, much less pay any claims. (Dybsky Decl. ¶ 3.) Pursuant to the Assignment, Community Bank agreed to fund the administrative expenses of the Assignee for the purposes of completing a sale of the Community Bank Collateral. (*Id.* ¶ 4.)

62.     Under Minnesota law, an assignment for the benefit of creditors filed with a court is treated as a general receivership and governed by the general receivership statutes. Minn. Stat. § 577.18 (applying Minn. Stat. §§ 576.21–.53 to assignments for benefit of creditors). Under Minn. Stat. § 576.23, the State Court holds exclusive authority over the Assignee, over the property

assigned to the Assignee under the Assignment, and over all matters otherwise arising in or relating to Assignment.[7]

63.     The Assignee gave notice of the Assignment to all creditors, including the Petitioning Creditors, as required by Minn. Stat. § 576.34. (Dybsky Decl. ¶ 2.)  Pursuant to Minn. Stat. § 576.35, subd. 1, all creditors, including the Petitioning Creditors, have standing to participate in the Assignment proceedings before the State Court. *Id.*

64.     Minnesota law further provides for a full, state court liquidation proceeding.  All collection actions are stayed upon the filing of the Assignment with the State Court. *Id.* § 576.42. The Assignee is permitted to sell assets, and creditors, including the Petitioning Creditors, are permitted to participate in that sale process. *Id.* §§ 576.29, subd. 1(b)(5), 576.46.  The Assignee has authority to assert rights, claims, causes of action, and defenses that relate to the assigned property. *Id.* § 576.29. Minnesota Statute Section 576.31 requires the Debtor to assist and cooperate with the Assignee and deliver all information requested by the Assignee related to the property assigned to the Assignee in the Assignment. *Id.* § 576.31. If necessary, the Assignee is permitted to subpoena the Debtor or any other party holding information regarding the assigned property. *Id.* § 576.29.  To the extent funds exist to make a distribution to unsecured creditors, Minnesota law authorizes the Assignee to make such a distribution and provides standing for creditors to object to any such distribution. *Id.* § 576.53. Under Minn. Stat. § 576.28, any party in

---

[7] Based on the assignment of the Debtor's assets to the Assignee and the State Court's jurisdiction over the Assignment, it is not clear if the property assigned to the Assignee would actually constitute bankruptcy estate property in this case. For purposes of this Motion, Community Bank will consider the assigned assets as property of the estate assets.  However, Community Bank expressly reserves the right to argue that the assigned assets do not constitute property of the estate because the Debtor did not hold legal and equitable title to the assigned assets on the petition date.

interest may conduct discovery of the Assignee regarding any matter relating to the Assignee's administration of the Assignment after obtaining an order from the State Court. *Id.*

65.     As the Assignment provides protections for creditors, including the Petitioning Creditors, permits the Assignee to liquidate the assets of the Debtor, and does not prejudice creditors due to Community Bank funding the administrative expenses, cause exists to dismiss this case under 11 U.S.C. § 305(a)(1). *In re Sun World Broadcasters, Inc.*, 5 B.R. 719, 723 (Bankr. M.D. Fla. 1980) (dismissing the case due to a concurrent state court liquidation proceeding nearing completion); *In re Duratech Indus., Inc.*, 241 B.R. 291, 300 (Bankr. E.D.N.Y.), *aff'd,* 241 B.R. 283 (E.D.N.Y. 1999) (abstaining from the bankruptcy case when the parties were involved in separate litigation before a different court); *In re Milestone Educ. Inst., Inc.*, 167 B.R. 716, 724 (Bankr. D. Mass. 1994) (suspending the bankruptcy court proceeding to allow the state court to address state-specific receivership issues).

66.     Further, cause exists to dismiss under 11 U.S.C. § 305(a)(1) because: (a) the Debtor already sought relief in a bankruptcy case that the Minnesota bankruptcy court concluded should be dismissed; (b) the Assignment provides for an economic and efficient administration of the Debtor's liquidation; (c) the Assignment before the State Court is a currently pending and appropriate forum to protect interests of all parties; (d) this involuntary proceeding is not necessary to reach a just and equitable solution; (e) the Assignment is a valid alternative means for achieving an equitable distribution of assets; and (f) it would be costly and time consuming to start fresh in this involuntary proceeding. *In re Texas EMC Mgmt., LLC*, 2012 WL 627844; *In re Monitor Single Lift I, Ltd.*, 381 BR 455.

67.     Similarly, the existence of the Assignment constitutes cause to dismiss under 11 U.S.C. § 707(a). *In re Bilzerian*, 258 B.R. 850, 858 (Bankr. M.D. Fla. 2001), *aff'd,* 276 B.R. 285

(M.D. Fla. 2002), *aff'd sub nom. Bilzerian v. SEC*, 82 F. App'x 213 (11th Cir. 2003) (finding cause existed to dismiss a Chapter 7 case due to a federal receivership already in place and the fact that the receiver would be acting similar to a Chapter 7 trustee, with broad powers to act under the supervision of the federal court); *see also United States v. Royal Bus. Funds Corp.*, 724 F.2d 12, 15 (2d Cir. 1983) (dismissing a Chapter 11 case due to the existence of a separate federal receivership proceeding in which the main secured lender had already funded significant administrative expenses).

**C.    The Debtor or Its Estate Lacks Assets to Fund Distributions to Creditors in a Chapter 7 Proceeding.**

68.    Community Bank holds a valid and perfected security interest in the Debtor's main significant assets—the Community Bank Collateral. (DIP Financing Mot. ¶ 18, Ex. D.) Community Bank's total claim against the Debtor is approximately $36 million. (*Id.*). All other assets of the Debtor are likewise encumbered by security interests or statutory liens. Based on an early forced liquidation appraisal and the expressions of interest of third-party buyers, the value of the Community Bank Collateral is insufficient to secure Community Bank's full claim and there is no equity in the collateral. (*Id.* Ex. F; Dybsky Decl. ¶ 12.)

69.    Prior to and after the Assignment, the Debtor and Assignee extensively marketed the Community Bank Collateral. (Dybsky Decl. ¶ 8.) After conducting this extensive marketing process, the Debtor and Assignee ultimately received two asset purchase agreements from third parties. (*Id.* ¶ 9.) The Assignee intends to serve a notice of the proposed sale on all creditors and seek approval of the sale by the State Court in the Assignment case. (*Id.* ¶ 10.)

70.    Based on the expected sale price of $10–11 million, there is no equity in the Community Bank Collateral, unsecured creditors would not benefit from the liquidation of the Community Bank Collateral in this involuntary proceeding, and Community Bank will hold a

significant deficiency claim after the sale, rendering Community Bank the largest unsecured creditor as well.

71.     Due to the lack of equity in the Community Bank Collateral and the lack of any additional significant assets not also encumbered by other secured creditors, cause exists to dismiss this proceeding under 11 U.S.C. § 305(a)(1) because unsecured creditors would receive no benefit in a Chapter 7 proceeding, a Chapter 7 trustee likely will abandon the encumbered assets, and the bankruptcy estate would incur significant administrative expenses.  *In re Bioline Lab'ys, Inc.*, 9 B.R. 1013, 1021 (Bankr. E.D.N.Y. 1981) (finding that cause existed for dismissal under 11 U.S.C. § 305 because general unsecured creditors would receive a minimal distribution, if any, and the expense of the bankruptcy liquidation would "eat up a major portion of any recovery"); *In re Luftek, Inc.*, 6 B.R. 539, 548 (Bankr. E.D.N.Y. 1980) (dismissing the case when the involuntary was filed by a group of recalcitrant creditors and the interests of other creditors would be best served by dismissal).

## II.     ALTERNATIVELY, CAUSE EXISTS TO GRANT COMMUNITY BANK RELIEF FROM THE AUTOMATIC STAY.

The filing of a petition for relief under Chapter 7 of the Bankruptcy Code operates as a stay of certain actions against the estate or property of the estate, including actions against a debtor that previously were, or could have been, commenced and acts to obtain possession of, exercise control over, or enforce a lien against property of the estate.  11 U.S.C. § 362(a).  The Bankruptcy Code provides, however, that a court "shall grant relief" from the automatic stay under certain circumstances, including "for cause" under 11 U.S.C. § 362(d)(1) or if the debtor lacks equity in the property and the property is not necessary for an effective reorganization pursuant to 11 U.S.C. § 362(d)(2).

A.    **Cause Exists to Grant Community Bank Relief from the Automatic Stay under Section 362(d)(1).**

72.    Section 362(d)(1) of the Bankruptcy Code provides that relief from the automatic stay shall be granted "for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1).

73.    "Cause has been defined to mean 'any reason whereby a creditor is receiving less than his bargain from a debtor and is without a remedy because of the bankruptcy proceeding.'" *Martens v. Countrywide Home Loans* (*In re Martens*), 331 B.R. 395, 398 (B.A.P. 8th Cir. 2005) (quoting *In re Food Barn Stores, Inc.*, 159 B.R. 264, 266 (Bankr. W.D. Mo. 1993)).

74.    The moving party bears the initial burden to establish a prima facie case demonstrating "cause," but once the moving party satisfies its burden, the burden shifts to the debtor, who must show that the moving party's interest is adequately protected.  11 U.S.C. § 362(g); *In re Lilyerd*, 49 B.R. 109, 116 (Bankr. D. Minn. 1985) (citing *Cont'l Bank v. Bobroff* (*In re Bobroff*), 32 B.R. 930, 931 (Bankr. E.D. Pa. 1983)); *see also In re Elmira Litho, Inc.,* 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994).

75.    Here, cause exists to grant relief from the automatic stay because Community Bank's interests in the Community Bank Collateral are not adequately protected.  The Debtor is in default and owes Community Bank at least $36 million. (DIP Financing Mot. ¶ 18, Ex. D.)  All of the evidence of value of the collateral demonstrates there is no equity in the collateral.  Based on an appraisal prior to the first bankruptcy filing, the value of the Community Bank Collateral is insufficient to secure Community Bank's full claim. (*Id.* Ex. F.) And based on the existing and pending offers received for the property of $10.5 million, Community Bank's claim of $36 million is substantially undersecured.  (Dybsky Decl. ¶ 9, 12.)  In addition, any Chapter 7 trustee here will have no funds to administer these assets by paying costs of insurance, security for the Plant, or

utilities without advances from Community Bank. (*Id.* ¶ __.)  Community Bank does not agree to fund such expenses in Chapter 7 and most likely any Chapter 7 trustee appointed here will move to abandon these assets.

76.     As Community Bank's interest in the Community Bank Collateral is clearly not adequately protected, cause exists to grant relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1).

**B.     Community Bank is Entitled to Relief from the Automatic Stay under Section 362(d)(2).**

77.     Pursuant to 11 U.S.C. § 362(d)(2), a court shall grant relief from stay if "the debtor does not have an equity in such property" and "such property is not necessary to an effective reorganization." *Id.*

78.     "Where there exists no equity in property that is the subject of a motion for relief from stay, it is incumbent upon a debtor to make a showing that the property is necessary to an effective reorganization in order to successfully defend against the motion." *In re Embassy Enters. of St. Cloud*, 125 B.R. 552, 554 (Bankr. D. Minn. 1991).

79.     "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.*"  *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988) (emphasis in original).

80.     In the context of 11 U.S.C. § 362(d)(2), the creditor has the initial burden of establishing the lack of equity and then the burden shifts to the party opposing relief to establish that the property is necessary for an effective reorganization.  *In re Anthem Comms./RBG LLC*, 267 B.R. 867, 870–71 (Bankr. D. Colo. 2001).

81.     The Debtor is in default and owes Community Bank at least $36 million. (DIP Financing Mot. ¶ 18, Ex. D.)  Community Bank's total claim against the Debtor is approximately $36 million. (*Id.*) Based on an appraisal prior to the first bankruptcy filing, the value of the Community Bank Collateral is insufficient to secure Community Bank's full claim. (*Id.* Ex. F.) Based on the existing and pending proposed sale of the Community Bank Collateral for $10.5 million, the value of the Community Bank Collateral remains insufficient to secure Community Bank's full claim. (Dybsky Decl. ¶ 9, 12.) Accordingly, the first element is satisfied.

82.     Also, the Petitioning Creditors are seeking entry of an order for relief under Chapter 7 of the Bankruptcy Code. Therefore, it is apparent the Community Bank Collateral is not necessary to an effective reorganization because there is no prospect of a reorganization here.  *In re Martens*, 331 B.R. at 398 ("This is a Chapter 7 liquidating bankruptcy case, therefore, by definition, the property is not necessary for an effective reorganization, which satisfies § 362(d)(2)(B).").

83.     For these reasons, relief from the automatic stay is warranted under 11 U.S.C. § 362(d)(2).

### C.     Community Bank is Entitled to Immediate Relief.

84.     Federal Rule of Bankruptcy Procedure 4001(a)(3) provides that an order granting a motion for relief from the automatic stay is stayed until 14 days after the entry of the order, unless a court orders otherwise. Fed. R. Bankr. P. 4001(a)(3). Here, Community Bank is entitled to immediate relief because the Debtor is in default and Community Bank needs to ascertain and maintain the condition of the Community Bank Collateral.

### III.    ANY HEARING ON THIS MOTION SHOULD BE TELEPHONIC TO MINIMIZE EXPENSES.

85.    Under Local Rule 9074-1, a party may make a request for a telephonic hearing in the Motion.

86.    In an effort to minimize the cost and expenses for all parties involved in this proceeding, Community Bank respectfully requests that any hearing on this Motion be held telephonically.

### <u>CONCLUSION</u>

87.    For the foregoing reasons, Community Bank respectfully requests that the Court grant the relief requested in the Motion.

**WHEREFORE**, Community Bank respectfully requests that the Court:

A.    Hold the hearing on this Motion telephonically;

B.    Dismiss this involuntary bankruptcy case under 11 U.S.C. §§ 305(a)(1) and 707(a);

C.    Or, in the alternative, grant Community Bank relief from the automatic stay under 11 U.S.C. § 362(d);

D.    Grant such other relief as the Court deems just and equitable.

Respectfully submitted,

Dated:  November 19, 2024

*/e/ Brandon R. Underwood*

Brandon R. Underwood (AT0012005)
**FREDRIKSON & BYRON, P.A.**
111 E Grand Avenue, Suite 301
Des Moines, IA 50309-1884
(515) 242-8920
bunderwood@fredlaw.com

Clinton E. Cutler (MN #0158094) (*pro hac vice* pending)
Steven R. Kinsella (MN #0392289) (*pro hac vice* pending)
Katherine A. Nixon (MN #0402772) (*pro hac vice* pending)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN  55402-4400
(612) 492-7000
ccutler@fredlaw.com
skinsella@fredlaw.com
knixon@fredlaw.com

**ATTORNEYS FOR COMMUNITY BANK & TRUST**