UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | Bankruptcy Case No. 24-01098 |
| Pure Prairie Poultry, Inc. f/k/a Pure Prairie Farms, Inc., | Involuntary Chapter 7 |
| Alleged Debtor. | |

**JOINT AND CONSOLIDATED RESPONSE OF PETITIONING CREDITORS IN OPPOSITION TO COMMUNITY BANK'S MOTION FOR ORDER DISMISSING CASE UNDER 11 U.S.C. §§ 305(a) or 707(a), OR, IN THE ALTERNATIVE, GRANTING RELIEF FROM THE AUTOMATIC STAY AND REQUEST FOR TELEPHONIC HEARING (ECF 12) AND TO THE MOTION OF THE BOARD OF DIRECTORS OF PURE PRAIRIE POULTRY, INC. FOR ORDER DISMISSING INVOLUNTARY BANKRUPTCY UNDER 11 U.S.C. §§ 303(a) AND 707(a) AND REQUEST FOR TELEPHONIC HEARING (ECF 39)**

Tri-State Poultry, LLC ("Tri-State"); Ekelr, LLC ("Ekelr"); Larry Falk ("Falk"); and Lee Frie ("Frie," and collectively, the "Petitioning Creditors"), jointly, and in response to Community Bank (the "Bank")'s *Motion for Order Dismissing Case Under 11 U.S.C. §§ 305(a) or 707(a)*, *or*, *in the Alternative*, *Granting Relief from the Automatic Stay and Request for Telephonic Hearing* [ECF 12] (the "Bank Motion"), as well as in response to the *Motion for Order Dismissing Involuntary Bankruptcy Under 11 U.S.C. §§ 303(a) and 707(a) and Request for Telephonic Hearing* filed by the Board of Directors of Pure Prairie Poultry, Inc., f/k/a Pure Prairie Farms, Inc., on behalf of Pure Prairie Poultry, Inc. [ECF 39] (the "Board Motion," and collectively, the "Motions") submit this Joint and Consolidated Response (the "Response") and respectfully request that the Court deny the Motions on a number of grounds. First, neither the Bank nor the Board has standing to contest the involuntary petition so the Motions, as filed, cannot be granted. Second, the Alleged Debtor is not a "farming operation" as set forth in the Bankruptcy Code, and thus, the involuntary

1

petition is proper, and the Motions, to the extent they argue otherwise, must be denied. Finally, the Assignment (as defined herein) does not sufficiently protect the interests of all creditors—including the Petitioning Creditors, thus abstention is inappropriate, and this Court should permit the case to proceed in the Bankruptcy Court.

With respect to the Bank's request (as well as Mr. Helgeson's) regarding stay relief, other than reserving surcharge or other subordination rights that may be available to the eventual trustee or other parties in interest under 11 U.S.C. § 506(c) and other applicable law, the Petitioning Creditors would not object to a grant of stay relief in favor of the Bank and Mr. Helgeson immediately effective upon the entry of the Order for Relief in this case in order to facilitate the sale of the real property and equipment securing their respective liens. The Petitioning Creditors also agree that any hearing should be held on a telephonic basis for the convenience of the parties.

## BACKGROUND

As noted by Community Bank in the Bank Motion, on September 20, 2024, Pure Prairie Poultry, Inc. (the "Alleged Debtor") commenced a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota. (Voluntary Pet., *In re Pure Prairie Poultry*, *Inc.*, No. 24-32426 (Bankr. D. Minn. Sept. 20, 2024) (the "Minnesota Bankruptcy Case"), ECF No. 1 (the "Petition").) As part of the Minnesota Bankruptcy Case, the Alleged Debtor did not file schedules. *See*, *generally*, Docket in Minnesota Bankruptcy Case.[1] The Minnesota case was dismissed on September 27, 2024. Further, also as noted in the Bank Motion, on October 21, 2024, the Alleged Debtor made an assignment for the benefit of creditors pursuant to Chapter 577 of the Minnesota Statutes in the Fifth Judicial District in Nicollet

---

[1] To the extent public records are referenced with this Response, the Petitioning Creditors agree that the Court may take judicial notice of such records and the facts contained therein. *See* Fed. R. Evid. 201; Fed. R. Bankr. P. 9017 (incorporating the Federal Rules of Evidence).

2

County, Minnesota. (*See* Assignment for the Benefit of Creditors, *Pure Prairie Poultry*, *Inc.* v. *Lighthouse Mgmt. Grp.*, *Inc.*, No. 52-CV-24-714, (Dist. Minn. Oct. 21, 2024), Index # 1 (the "Assignment").) (*See* ECF 12-1 – Exhibit A to the Bank Motion.) Despite the Assignment having been filed 51 days ago, and despite the prior filing of the Minnesota Bankruptcy Case approximately one month prior to that, the Alleged Debtor has not disclosed any schedules or lists of debts, transfers within the 90 days prior to the filing, or other financial information other than as set forth in the Motions and the attendant declarations of George Peichel in support of the First Day Motions in the Minnesota Bankruptcy Case and the Motions in this case, respectively.

Accordingly, to the extent the Court entertains the Bank Motion, and otherwise with respect to the Board Motion, the Petitioning Creditors cannot yet contest the facts set forth by in the Motions, though they reserve the right to do so pursuant to the rules made applicable in this context pursuant to Bankruptcy Rule 1018. *See* Fed. R. Bankr. P. 1018.

## ARGUMENT

**I.    MOVANTS AND THE BOARD OF DIRECTORS OF THE ALLEGED DEBTOR DO NOT HAVE STANDING TO CHALLENGE THE INVOLUNTARY PETITION.**

Rule 1011 of the Federal Rules of Bankruptcy Procedures sets forth the entities who may contest in involuntary petition. Fed. R. Bankr. P. 1011. In relevant part, the rule provides:

> (a) Who May Contest Petition. The debtor named in an involuntary petition may contest the petition. In the case of a petition against a partnership under Rule 1004, a nonpetitioning general partner, or a person who is alleged to be a general partner but denies the allegation, may contest the petition.

*See* Fed. R. Bankr. P. 1011(a). Notably, the rule mentions nothing regarding whether a senior secured creditor of the alleged debtor (or any other party in interest—including a debtor's board of directors) may contest the filing of an involuntary petition—a conspicuous and meaningful absence because parties in interest are textually provided the ability to make a motion to dismiss the

3

case at a later time and in different circumstances. *See*, e.g., 11 U.S.C. §§ 707(b) & 1112(b). Where Congress places an express requirement in one part of a statute but leaves it out of another, courts should not "add[ ] that term" where it was "conspicuously absent." *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010).

While the Bank (or any party in interest) may move to dismiss the case *after* the order for relief has been granted, § 303 provides only that the Alleged Debtor may file an answer, and the petition may be dismissed in certain circumstances—none of which are present here. Tellingly, neither the Bank nor the Board presents any authority conferring standing upon either of them to stand in the shoes of the Alleged Debtor. Accordingly, the Motions should be denied because of the Bank's and the Board's lack of standing to challenge the involuntary petition.

## II.    THE ALLEGED DEBTOR IS NOT A FARMER.

Both the Board and the Bank seek dismissal of this case because they assert the Alleged Debtor is a "farmer" as defined by the Bankruptcy Code, and thus, an involuntary case may not be commenced against it. Section 303(a) of the Bankruptcy Code permits the commencement of an involuntary case "only under chapter 7 or 11 of this title, and only against a person, except a farmer…" 11 U.S.C. § 303(a). Further, the Bankruptcy Code defines "farmer" as a:

> person that received more than 80 percent of such person's gross income during the taxable year of such person immediately preceding the taxable year of such person during which the case under this title concerning such person was commenced from a farming operation owned or operated by such person.

11 U.S.C. § 101(20). The Bankruptcy Code further defines "person" as including an "individual, partnership, and corporation." 11 U.S.C. § 101(41). The Bankruptcy Code defines "farming operation" as including "tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an *unmanufactured state*." 11 U.S.C. § 101(21) (*emphasis added*).

4

"Unmanufactured" is an adjective that unequivocally describes something that has not been manufactured. For example, unmanufactured eggs are eggs that have been washed in preparation for sale. Eggs that are cracked and sold as liquid eggs are not unmanufactured. (*See* https://www.wattagnet.com/egg/egg-processing/article/15527477/liquid-egg-processing-proce-dures-key-to-egg-market-wattagnet, which provides an outline of the process of taking eggs produced by a chicken and converting them to liquid eggs, which is clearly a manufacturing process.)[2] The First Peichel Decl. explains in detail the manufacturing process engaged in by the Alleged Debtor after the chickens are delivered to the processing plant in Charles City.[3,4] Paragraph 10 of the First Peichel Decl. states:

> In November 2022, Debtor's revenue-generating operations at the Plant officially commenced, albeit in a limited capacity. At that time, Debtor was equipped to engage in "primary processing" or "first processing" only.[1]

(*See* First Peichel Decl. at ¶ 10.) The footnote 1 after the quote above states:

> In the poultry industry, "primary processing" or "first processing" refers to the process of receiving, staging, slaughtering, scolding and de-feathering, eviscerating and chilling whole birds for further packaging and sale.

(*See* First Peichel Decl. at ¶ 10, FN 1.) The relevant portions of Paragraph 11 of the First Peichel Decl. provide:

---

[2] A copy of the information contained in the weblink is attached as Exhibit A to the Declaration of Joseph A. Peiffer (the "Peiffer Decl.") submitted herewith.

[3] (*See*, *generally*, First Peichel Decl.) For the avoidance of doubt, the First Peichel Decl. refers to ECF No. 6 filed in the Minnesota Bankruptcy Case; the Second Peichel Decl. refers to ECF No. 12-2 filed in this case as part of the Bank Motion; and the Third Peichel Declaration refers to ECF No. 40 filed in this case in support of the Board Motion. ECF 40 and ECF 12-2 appear to be substantially the same, with modified captions. A copy of the First Peichel Decl. is attached as Exhibit B to the Peiffer Decl.

[4] For the avoidance of doubt, unless otherwise defined herein, capitalized terms used in this Response shall have the meanings ascribed to them in the Motions.

5

> Throughout the end of 2022 and through the first ten months or 2023, the Company expanded the Plant to become fully operational. By November 2023, its capacity included "secondary processing" capabilities,[2] which enabled it to market a broader array of poultry products to customers including, but not limited to, retail grocery stores.

(*See* First Peichel Decl. at ¶ 11.) Footnote 2, after the words, "secondary processing," reads as follows:

> "Secondary processing" can include portioning, deboning, marinating, forming, cooking and packaging ready-to-eat poultry.

(*See* First Peichel Decl. at ¶ 11 FN 2.)

Everything done by the Alleged Debtor in its Charles City, Iowa processing plant constitutes manufacturing. Therefore, the Alleged Debtor is not a farmer as its income is produced from the sale of *manufactured* poultry products—not poultry in an unmanufactured state (as the statute requires). *See* 11 U.S.C. § 101(21) This is further borne out by the Second Peichel Decl. filed in conjunction with the Bank Motion— reproduced below with emphasis added:

**Pure Prairie Poultry, Inc.**
**PPP Group : Pure Prairie Poultry, Inc.**
**Income Statement**

**January 2024 - October 2024**

| Financial Row | Amount |
|---|---|
| **Ordinary Income/Expense** | |
| Income | |
| 40000 - Revenue from Operations | |
| 40005 - Revenue from Chicken Products | $38,368,909.82 |
| 40010 - Revenue - Eggs | $1,247,392.50 |
| 40015 - Revenue - Bi-Products | $3,842.92 |
| 40020 - Discounts | ($227,317.62) |
| 40100 - Freight Revenue | $616,638.38 |
| Total - 40000 - Revenue from Operations | $40,009,466.00 |
| Total - Income | $40,009,466.00 |

6

(*See* Second and Third Peichel Decl. at p. 152)

From January 1, 2024 through October 31, 2024, the Alleged Debtor received $38,368,909.82 from the sale of Chicken Products and $1,247,392.50 from the sale of Eggs. (*Id*.) The Petitioning Creditors concede that the sale of eggs is the sale of a farm product in its unmanufactured state. Having given that concession, only 3.15% of the Alleged Debtor's income in 2024 comes from the sale of farm products in an unmanufactured state—a far cry from the 80% required by 11 U.S.C. § 101(20).

This Court has already addressed a nearly identical situation in which a debtor alleged that it was a "farmer" eligible to file a Chapter 12 bankruptcy but based on the manufactured nature of its ultimate products, this Court found it unqualified as a family farmer and dismissed the Chapter 12 case. *See In re Miller*, 122 B.R. 360, 362 (Bankr. N.D. Iowa 1990). In *Miller*, this Court determined that because the logs the debtor harvested—i.e., the unmanufactured farm product—were processed into boards in its sawmill, dried in its kiln, and sold as boards for builders to use, the revenue it received was not from unmanufactured products, but manufactured ones. *Id*. at 362. Accordingly, the debtor in *Miller* was not entitled to be a debtor under chapter 12, as it did not qualify as a "farmer" under the Bankruptcy Code.

Like the debtor in the *Miller* case, the actions of the Alleged Debtor in primary and secondary processing of chickens in its Charles City Plant is *admittedly* manufacturing. (*See* Second and Third Peichel Decl. at p. 152.) Therefore, the output of that plant is not a farm product in its unmanufactured state. In the instant case, the individual growers whose businesses are charged with the cultivation, maintenance, and growth of the chickens that are ultimately processed by the Alleged Debtor are the only entities engaging in "farming operations" as provided under the Bankruptcy Code. The "farming operation" stops when the live chickens are delivered to the Alleged

7

Debtor's processing plant in Charles City. Because the Alleged Debtor is not selling live chickens, but manufactures the chicken into processed chicken products it sells to regional grocery stores and food markets, its revenue does not come from a "farming operation" and the Alleged Debtor is not a "farmer" under the Bankruptcy Code. This Court should enter an order for relief. *See* First Peichel Decl. at ¶ 11.

> A. **The loans made by Community Bank to the Alleged Debtor were for a manufacturing facility, not a farming facility.**

The First Peichel Decl. provides further information regarding the fact that the Alleged Debtor is not a farmer in Paragraph 19 wherein it states:

> Just weeks prior to the initial rollout, on October 21, 2022, the United States Department of Agriculture (the "USDA") issued a news release stating that it was "investing $38,720,000 under the Food Supply Chain Guaranteed Loan Program [(the "FSC Loan")] to help Pure Prairie Farms Inc. expand capacity to process poultry and create job opportunities for people living in rural Iowa." In the same press release, the USDA stated that it was "investing a $6,963,725 grant in [Pure Prairie] from the Meat and Poultry Processing and Expansion Program. The funding is part of the Biden-Harris Administration's commitment to strengthen critical food supply chain infrastructure to create more thriving communities for the American people."

(*See* First Peichel Decl. at ¶ 19.) The November 4, 2022, news release cited in paragraph 19 of the First Peichel Decl. states in relevant part in the first paragraph:

> [T]he Department is investing $38,720,000 under the Food Supply Chain Guaranteed Loan Program to help Pure Prairie Farms, Inc. *expand capacity to process poultry* and create job opportunities for people living in rural Iowa. The department is also investing a $6,963,725 grant in the premium chicken integrator from the Meat and Poultry Processing Expansion Program.[5] (Emphasis added.)

---

[5] A copy of the news release referred to in paragraph 19 of the First Peichel Decl. is attached as Exhibit C to the Peiffer Decl. The link to that same news release is: https://www.rd.usda.gov/newsroom/news-release/biden-harris-administration-invests-456-million-help-pure-prairie-farms-inc-expand-processing.

8

(*See* Exhibit C to the Peiffer Decl.) In the press release, reference is made to the Meat and Poultry Processing Expansion Program (MPPEP) with a link to information about the program.[6] The first question on the link about the MPPEP is:

> **What does this program do?** The Meat and Poultry Processing Expansion Program (MPPEPP provides grants to help eligible processors expand their processing capacity, which create new, better and more processing for meat and poultry producers.

(*See* Exhibit D to the Peiffer Decl.) The debtor in *In re Miller* borrowed money for the purpose of purchasing the equipment to process a traditional farm product (logs) into a finished product, lumber that it sold to builders. *Miller*, 122 B.R. at 360. Here, the Alleged Debtor borrowed money under the Food Supply Chain Guaranteed Loan Program to expand its *processing* capacity. The Alleged Debtor obtained a grant from the MPPEP to expand its *processing* capacity. Processing poultry as either a "primary processing" or "secondary processing" is undoubtedly manufacturing. 11 U.S.C. § 101(21) requires that a farming operation produces farm products in an *unmanufactured* state. The sale of live chickens would be production of a farm product in an unmanufactured state. Similarly, the sale of unbroken eggs is production of a farm product in an unmanufactured state.

But here, the actions of the Alleged Debtor in slaughtering, scolding and de-feathering, and eviscerating chickens in primary processing, and portioning, deboning, marinating, forming, cooking and packaging the chickens that have been through the primary processing as part of the secondary processing, is simply manufacturing, and cannot be reasonably construed in any other light.

Further, the loans and grants received by the Alleged Debtor and outlined in the USDA news release demonstrate that the Alleged Debtor was a processor of chicken—a producer of

---

[6] *See* Exhibit B to the Peiffer Decl., a copy of the page that appears when the link in the news release to the Meat and Poultry Processing Expansion Program is accessed.

9

chicken in a manufactured state. As a manufacturer of chicken products, the Alleged Debtor is not a farmer, and it is appropriate for this Court to enter its order for relief under § 303(a).

### III. ABSTENTION IS IMPROPER

The standard and factors for bankruptcy court abstention are guided by both statutory provisions and case law. The relevant statute is 28 U.S.C. § 1334, which outlines the conditions under which a court may or must abstain from hearing a proceeding related to a bankruptcy case. In reviewing a request for permissive abstention, a court may abstain from hearing a proceeding in the interest of justice, comity with state courts, or respect for state law. *See* 28 U.S.C. § 1334(c)(1). The factors considered for permissive abstention include:

1. Effect on the efficient administration of the estate.
2. Extent to which state law issues predominate over bankruptcy issues.
3. Difficult or unsettled nature of applicable law.
4. Presence of a related proceeding commenced in state court or other nonbankruptcy court.
5. Jurisdictional basis other than the debtor's bankruptcy filing.
6. Degree of relatedness or remoteness of the proceeding to the main bankruptcy case.
7. Substance rather than form of an asserted "core" proceeding.
8. Feasibility of severing state law claims from core bankruptcy matters.
9. Burden on the bankruptcy court's docket.
10. Likelihood of forum shopping.
11. Existence of a right to jury trial.
12. Presence in the proceeding of nondebtor parties.

*In re Stabler*, 418 B.R. 764, 769 (8th Cir. BAP 2009); *In re Civic Partners Sioux City, LLC*, No. ADV 11-9045, 2012 WL 761361, at *13 (Bankr. N.D. Iowa Mar. 8, 2012). Because none of the factors in this matter militate in favor of abstention under 8th Circuit precedent, the Bank Motion should be denied.[7]

    **A.**    **The Assignment does not provide the same transparency, litigation protections, or jurisdiction for creditors to have their claims adjudicated as does the bankruptcy case.**

Petitioning Creditors do not contest the Bank's assertions that, generally, an assignment for the benefit of creditors is treated as a general receivership and governed by the general receivership statutes. Minn. Stat. § 577.18 (applying Minn. Stat. §§ 576.21-576.53 (the "Minnesota Receivership Statute") to assignments for benefit of creditors). But the Bank fails to address the shortcomings of the Minnesota Receivership Statutes from the perspective of creditors—and specifically, the Petitioning Creditors, that militate against this Court abstaining from exercising jurisdiction over this matter.

    **1.**    **There is no opportunity for creditors to conduct discovery into claims against the Assignor/Debtor.**

The Minnesota Receivership Statute does not contain a provision that permits creditors to investigate the conduct of the entity over which the Receiver is appointed. *See generally*, Minn. Stat. §§ 576.21 576.53. The only provision that permits discovery at all is § 576.28, which provides, in relevant part, that "(a) party or party in interest may conduct discovery of the receiver concerning any matter relating to the receiver's administration of the receivership property after obtaining an order authorizing the discovery." Minn. Stat. § 576.28. The Petitioning Creditors do not yet have any disputes regarding the Assignee's administration of the Assignment or property

---

[7] The Bank, in the Bank Motion, cites to numerous authorities regarding the standard for abstention from other jurisdictions—none of which is binding on this Court. *See* Bank Motion at pp 11-12.

11

subject thereto—though they reserve all rights. Regardless, this is not comparable to the expansive discovery allowed to creditors under Bankruptcy Rule 2004. *In re Countrywide Home Loans*, *Inc*., 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008) ("The scope of Rule 2004 examinations is recognized as broad, unfettered and in the nature of a 'fishing expedition.'"). The Petitioning Creditors, *and all creditors*, deserve the benefits of fulsome discovery afforded them by the Bankruptcy Code and effectively denied within the confines of the Assignment in Minnesota.

> 2. **The Minnesota Receivership Statute does not contain rights for the benefit of creditors to the same extent of the Bankruptcy Code.[8]**

Undoubtedly, under the Minnesota Receivership Statute, the Assignee has authority to assert rights, claims, causes of action, and defenses that relate to the assigned property. Minn. Stat. § 576.29. However, such rights and claims do not include claims or rights provided under federal bankruptcy law—meaning that the Assignee, in order to prosecute claims against the Alleged Debtor related to prepetition transfers, would need to do so under the Minnesota Uniform Voidable Transfers Act ("MUVTA"), and would have neither of Bankruptcy Code sections 547 or 548 at its disposal. Conversely, a bankruptcy trustee would have those same rights afforded the Assignee under MUVTA or other applicable state law but would *also have* the benefit of the more expansive powers conferred under the Bankruptcy Code.[9] No creditors are worse off if the trustee has more

---

[8] In its Motion, the Alleged Debtor's Board alludes to whether the filing of the involuntary petition against the Assignee may be a violation of the stay in the Assignment. Notably, the Minnesota Receivership Statute expressly provides that the entry of an order appointing a receiver does not operate as a stay of "the commencement of a bankruptcy case under federal bankruptcy laws". Minn. Stat. § 576.42, Subd. 6(9).

[9] Of particular note and concern of the Petitioning Creditors, the independence of the bankruptcy trustee is paramount to investigate the dealings of the Alleged Debtor leading to its insolvency and the harms suffered by all creditors as a result. Strangely, Alleged Debtor counsel in the Minnesota Bankruptcy Case, after the dismissal thereof, was then *retained as counsel for the Assignee*—putting said counsel in the position of investigating, for the benefit of the Alleged Debtor's creditors, the very debtor entity it had only just stopped representing in the Minnesota Bankruptcy Case.

12

power to recover funds for their benefit. Additionally, and as stated *supra*, the Assignee (i.e., the Alleged Debtor) has produced no analysis of preferences or other potential transfers despite having multiple months to do so. An examination of the First Peichel Decl. reveals the following potential preferential transfers made within 90 days of the date of filing the Involuntary Petition (November 7, 2024) recoverable by the chapter 7 trustee, that cannot be recovered by the Assignee:

- **Family Funding Group LLC**, a merchant cash advance creditor, did not perfect its security interest. On July 8, 2024, the Alleged Debtor received $450,000. On the date of filing the Minnesota Bankruptcy Case, Family Funding Group was only owed $249,500. Any transfers made by the Alleged Debtor to Family Funding Group after August 8, 2024 are preferential transfers.[10]

- **Dynasty Capital 26, LLC** did not perfect its security interest related to a Future Receipts Agreement. Any transfers made by the Alleged Debtor to Dynasty Capital 26, LLC after August 8, 2024 are preferential transfers.[11]

- **Ace Funding Source LLC** entered a Revenue Purchase Agreements with the Alleged Debtor on August 6 and 7, 2024. It did not perfect its security interest until September 9, 2024, 34 and 33 days respectively after the Alleged Debtor received funds. Any transfers made by the Alleged Debtor to Ace Funding Source LLC after August 8, 2024 are preferential transfers as the lien was perfected within the preference period and is thus, avoidable for the benefit of creditors.[12]

- **Liquidity Access LLC** entered into a Future Receivables Sale and Purchase Agreement with the Alleged Debtor on August 16, 2024. Liquidity Access failed to perfect its security interest. Therefore, all payments made to Liquidity Access after August 8, 2024, including the $167,242.50 paid to it allocated to an existing balance, are preferential transfers that should be recoverable by a trustee in a chapter 7 bankruptcy.[13]

---

This is another reason the Court should permit the bankruptcy process to play out and lend transparency to an otherwise murky situation related to this Alleged Debtor.

[10] *See* First Peichel Decl. at ¶ 38.

[11] *Id*. at ¶ 39.

[12] *Id*. at ¶ 40.

[13] *Id*. at ¶ 41.

13

- **Unknown preferential transfers** As noted, *supra*, the Alleged Debtor has never prepared schedules (in either the Minnesota Bankruptcy Case or the Assignment) and there are likely additional preferential transfers that a Chapter 7 trustee could uncover that could not be recovered in the Assignment by the Assignee.

While the Petitioning Creditors do not contest, currently, that the Bank may well be one of the largest unsecured creditors in this case, that does not mean that the interests of all unsecured creditors should be obviated in favor of a state court proceeding that affords such creditors fewer rights, less transparency, and which grants the trustee (or Assignee) fewer avenues to recover on their behalf.

### 3. Creditors do not have the right to prosecute claims against the Alleged Debtor without leave of the Minnesota Court and additional expense and motion practice.

The Bankruptcy Code permits parties in interest to bring litigation claims related to the conduct of the Alleged Debtor prior to or during the pendency of a bankruptcy case. *See*, *generally*, Fed. R. Bankr. P. 7001. No such corollary provision exists with respect to the Minnesota Receivership Statute applicable to the Assignment. *See generally*, Minn. Stat. §§ 576.21-576.53. In fact, the Minnesota Receivership Statute specifically provides a stay of all potential judicial actions related to the Alleged Debtor. *See* Minn. Stat. § 576.42. While the Petitioning Creditors concede that the stay may be modified by order of the Court, the standard for such relief is unclear, and in any event, requires the creditor to prevail on a motion before advancing its litigation claims—adding additional time and expense unnecessary within the confines of a bankruptcy case. For example, many of the growers in this matter may have standalone claims against this Alleged Debtor under the Packers and Stockyards Act. (*See* the Dybsky Declaration at ECF 12-3, at ¶ 7.) Such claims are appropriately brought in federal court as they relate to a federal statute, and could easily be brought in an adversary case within the Bankruptcy Case. However, it is unclear the extent to which such federal claims could be barred by the stay in the Assignment as a result of

14

the Minnesota Receivership Statute. *See* Minn. Stat. § 576.42. In this instance as well, the interests of creditors of the Alleged Debtor are simply better served in the Bankruptcy Case than the Assignment.

> 4. **Creditors are not sure what assets of the Assignor have been transferred to the Assignee as part of the Assignment.**

Section 541 of the Bankruptcy Code provides that the commencement of a bankruptcy case creates an estate comprised of all legal or equitable interests of the debtor in property as of the date commencement of the case (with limited exceptions). *See* 11 U.S.C. § 541. Conversely, the Assignment involves the assignment by the Alleged Debtor of certain enumerated property set forth in Exhibit A to the Assignment. (*See* ECF 12-1 and Exhibit A thereto.) Without the discovery afforded to creditors under Rule 2004 of the Bankruptcy Rules, there is no current ability for creditors to inquire as to what property of the Alleged Debtor *was not* assigned to the Assignee pursuant to the Assignment. *See generally*, Minn. Stat. §§ 576.21-576.53. Instead, creditors are required to take the word of the Alleged Debtor and its principals as to the existence of additional property that may be used to satisfy their claims. The Bankruptcy Code permits no such equivocation or mystery and affords creditors the ability to investigate the Alleged Debtor (and its principals) on their own should they deign to do so. In this respect as well, abstention serves to hinder, and not help, the creditors in this case—even the joining parties who have been presented with an illusory Hobson's choice. The creditors in this case can have the benefit of an orderly and expedited sale process, and also have the right to investigate the Alleged Debtor to the fullest extent allowable by federal bankruptcy law.

15

    **5.** **The Assignment has not proceeded in such a way and to such an extent that prejudice would occur if the case continued in the Bankruptcy Court.**

The involuntary petition was filed seventeen days after the Assignment was filed—thus the Assignment cannot reasonably be deemed to have progressed to the point where the cost of the bankruptcy case would far exceed the benefit to creditors—especially where the information obtained in the course of the Assignment can easily be transferred to the Trustee—and the purported sale process can be easily continued by the Trustee if necessary. Abstention is inappropriate in this respect as well. In addition, on December 3, 2024, the court in the Assignment acknowledged the automatic stay afforded by the filing of the involuntary bankruptcy petition, therefore, presumably nothing has occurred within the Assignment since the recognition of the automatic stay by the Minnesota Court.[14]

### IV. PETITIONING CREDITORS DO NOT OBJECT TO RELIEF FROM STAY, PROVIDED SURCHARGE OR EQUITABLE SUBORDINATION REMEDIES REMAIN AVAILABLE TO THE ESTATE.

The Bank (and Mr. Helgeson, for that matter) argue that the automatic stay should be lifted if this matter continues in the Bankruptcy Court because (a) there is no equity in the real or personal property subject to their respective liens, and (b) such property is not necessary to a reorganization (as this is a chapter 7 case—there is no reorganization to speak of). (*See* Bank Motion, p. 19; ECF 38—the Helgeson Motion for Relief from Stay.)[15] The Petitioning Creditors do not

---

[14] See Assignment Order dated December 3, 2024 attached to the Peiffer Decl. as Exhibit E.

[15] The Petitioning Creditors Note that Mr. Helgeson does not appear to have followed the procedural requirements to provide notice of his motion having filed it on eleven days' notice and couched his motion as a joinder. (*See* ECF 38.) Among other things, Mr. Helgeson provides the value of the collateral securing his loan on "information and belief" in contravention of L.R. 4001-1(b)(3) and fails to attach the relevant notes or other debt instruments to his "motion" in contravention of L.R. 4001-1(b)(4). (*Id.*) Further, to the extent Mr. Helgeson seeks relief on an expedited basis, his motion does not set forth the grounds for expedited relief, and the Petitioning Creditors assert no response is yet required and reserve all rights.

16

dispute these arguments and concede that facially, the indebtedness owed to the Bank and Mr. Helgeson, jointly or severally, appears to dwarf the value of such property. However, to the extent stay relief may be appropriate, the Petitioning Creditors assert that it is inappropriate for any sale of the real property (or any property) to occur through the Assignment, as that case should be stayed pending the continuation of this Bankruptcy Case. The Bank (or Mr. Helgeson) may be entitled to exercise their respective rights under applicable state law, but not through the Assignment process.

## V. PETITIONING CREDITORS' CONSENT TO A TELEPHONIC HEARING.

Petitioning Creditors agree that a telephonic hearing is necessary for the convenience of the parties in interest.

## CONCLUSION

The Alleged Debtor does not derive the threshold percentage of its revenue from the sale of unmanufactured poultry nor from the raising of the same to qualify as a farmer under the Bankruptcy Code. As such, the involuntary petition is appropriate to commence the Bankruptcy Case. Further, because proceeding in the Bankruptcy Court presents the same opportunities for sale of the Alleged Debtor's processing facility as does the Assignment, but with substantially more protection for all creditors of the Alleged Debtor, abstention is unwarranted. Accordingly, the Petitioning Creditors respectfully request that this Court deny the Motion, enter the order for relief, and grant them such other and further relief as the Court deems just and equitable under the circumstances.

                Respectfully submitted,

                **AG & BUSINESS LEGAL STRATEGIES**

Dated: December 11, 2024      By:  */s/ Joseph A. Peiffer*
                                        Joseph A. Peiffer (AT0006160)
                                        Austin J. Peiffer (AT0014402)
                                        P.O. Box 11425
                                        Cedar Rapids, Iowa 524-1425
                                        Telephone: (319) 363-1641
                                        Fax: (319) 200-2059
                                        Email: joseph@ablsonline.com
                                                austin@ablsonline.com

                ***Attorneys for Petitioning Creditors Tri-State Poultry, LLC; Ekelr, LLC; Larry Falk; and Lee Frie***

                and

                **BASSFORD REMELE**
                *A Professional Association*

Dated: December 11, 2024      By:  */s/ Jeffrey D. Klobucar*
                                          Jeffrey D. Klobucar (MN #0389368)
                                        (*Admitted Pro Hac Vice*)
                                        100 South Fifth Street, Suite 1500
                                        Minneapolis, MN 55402
                                        Phone: (612) 333-3000
                                        Fax: (612) 333-8829
                                        Email: jklobucar@bassford.com

                ***Attorneys for Petitioning Creditors Tri-State Poultry, LLC; Ekelr, LLC; and Lee Frie***