UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

Pure Prairie Poultry, Inc. f/k/a Pure Prairie Farms, Inc.,

Debtor

Chapter 7

Bankruptcy No. 24-01098

**OPINION AND ORDER ON MOTIONS TO DISMISS**

The matters before the Court are Community Bank & Trust's ("CBT") Motion to Dismiss (Doc. 12) and Motion for Relief from Stay (Doc. 23), Michael Helgeson's Motion for Relief from Stay (Doc. 38), and Pure Prairie Poultry, Inc.'s ("Pure Prairie" or the "Alleged Debtor") Motion to Dismiss (Doc. 39). Interested Party Growers (the "Growers") and Helgeson joined CBT's Motion to Dismiss (Doc. 29, Doc. 38). A telephonic hearing was held on December 13, 2024. The following appearances were entered: Clinton E. Cutler on behalf of CBT; Krystal Mikkilineni and Erik Ahlgren on behalf of the Growers; Jeffrey D. Goetz and Elissa Holman on behalf of Pure Prairie Poultry, Inc.; Alexandria Quinn-Hanse on behalf of the United States Trustee; Joseph Peiffer on behalf of Tri-State Poultry, LLC, Ekelr, LLC, Lee Frie, and Larry Falk (the "Petitioning Creditors"); Jeffrey D. Klobucar on behalf of Tri-State Poultry, LLC, and Ekelr, LLC; Kristina M. Stanger and Jaden Banks on behalf of First Cooperative Association (d/b/a AgState); Collin M. Davison on behalf of Henkel Construction Company; Jacob Larson on behalf the Iowa Department of

Agriculture and Land Stewardship; Charles E. Nelson on behalf of Michael Helgeson. The Court heard argument and took the matters under advisement on the papers submitted. This is a core proceeding under 28 U.S.C. §§ 157 and 1334.

## I. BACKGROUND/STATEMENT OF THE CASE

On November 7, 2024, the Petitioning Creditors filed a Chapter 7 Involuntary Petition against Pure Prairie. On November 19, 2024, CBT filed its Motion to Dismiss, in which the Growers and Michael Helgeson later joined. On December 12, 2024, Pure Prairie filed its own Motion to Dismiss.

## II. FINDINGS OF FACT

Pure Prairie is a Minnesota-based poultry producer with a production plant located in Charles City, Iowa. Pure Prairie purchases pullet chicks from a breeding stock company and contracts for the care and feeding of those chicks until they are twenty weeks old. At twenty weeks, the chicks are transferred to breeder barns where they become laying hens for approximately forty-five weeks. Those eggs are then taken to a custom hatchery. Once those chicks hatch, they are taken to barns to be raised for six weeks. At that time, Pure Prairie picks up the birds and delivers them to its processing plant, where they are processed and later sold as whole chickens or chicken parts packaged in retail tray packs or boxes for sale to food service. At all relevant times, Pure Prairie is the owner of the birds and eggs. It pays for the use of

facilities, labor, feed, vaccines, and utility costs related to the raising of birds and hatching of eggs.

Pure Prairie filed a Chapter 11 petition in the United States Bankruptcy Court for the District of Minnesota on September 20, 2024. See In re Pure Prairie Poultry, Inc., No. 24-32426 (Bankr. D. Minn. Sept. 20, 2024). This was short-lived, however, as the case was dismissed on Pure Prairie's own emergency motion on September 27, 2024. The motion, filed just two days prior to dismissal, argued that dismissal was necessary for a number of reasons: (1) Pure Prairie lacked sufficient cash collections to pay ongoing expenses and would incur $10,800,000 in negative cash flow during the first six weeks of the case; (2) it could not obtain post-petition financing on terms acceptable to its secured lenders; (3) it experienced production disruptions and vendor delays causing negative impacts on operations; and (4) it lacked the resources or cash to continue operations while seeking restructuring through the Chapter 11 process. None of the Petitioning Creditors appeared at the hearing or objected to dismissal, nor did any other party in interest. The United States Trustee did not oppose dismissal, acknowledging that there appeared to be no equity in the assets for unsecured creditors and that a Chapter 7 trustee would likely abandon the assets.

Following dismissal of the Chapter 11 case, Pure Prairie made an assignment for the benefit of creditors (the "Assignment") in the Fifth Judicial District in

3

Nicollet County, Minnesota, pursuant to Chapter 577 of the Minnesota Statutes and a general receivership was established pursuant to Chapter 576. As part of the Assignment, Pure Prairie assigned its assets to Lighthouse Management Group. As of the date of the Assignment, Pure Prairie had ceased operations and terminated the majority of its employees, retaining only a limited number necessary to protect and preserve the existing assets. Community Bank has agreed to fund the ongoing expenses of the Assignment, including payment of utilities, insurance, and security of the plant.

This involuntary proceeding was filed on November 7, 2024, against Pure Prairie by four of its unsecured creditors; Larry Falk, Tri-State Poultry, LLC, Ekelr, LLC, and Lee Frie. Their claims amount to approximately $2,635,561.28. The total debt, both secured and unsecured, amounts to over $113 million.

### III. CONCLUSIONS OF LAW/DISCUSSION

The Board of Directors asks the Court to dismiss this involuntary proceeding under 11 U.S.C. §§ 303(a) and 707(a). The Board argues that Pure Prairie is a "farmer" as defined in 11 U.S.C. § 101(20) and is therefore ineligible to be a debtor in an involuntary bankruptcy under section 303(a). For this reason, it argues that cause exists for dismissal under section 707(a). CBT also asks the Court to dismiss this case, arguing that cause exists under section 305(a)(1), which provides that a court may dismiss an involuntary proceeding at any time if dismissal would better

4

serve the interests of creditors and the debtor. The Petitioning Creditors argue that neither the Board nor CBT have standing to challenge the involuntary petition, that Pure Prairie is not a "farmer," and that dismissal would not better serve the interests of the creditors and the Alleged Debtor.

A. Standing

*1. The Board of Directors*

The Petitioning Creditors first argue that the Board of Directors lacks standing to challenge the involuntary petition. In support of this argument, the Creditors cite to Federal Rule of Bankruptcy Procedure 1011(a), which limits those who may contest the involuntary petition to the named debtor only. Fed. R. Bankr. P. 1011(a) ("A debtor may contest an involuntary petition filed against it."). Because parties in interest are expressly permitted to make a motion to dismiss "at a later time and in different circumstances," they assert that "[w]here Congress places an express requirement in one part of a statute but leaves it out of another, courts should not 'add[] that term' where it was 'conspicuously absent." While the Court agrees with this assertion, the Creditors fail to account for the fact that the Alleged Debtor in this case is a corporation and the Board of Directors is not merely a party in interest.

Federal Rule of Bankruptcy Procedure 9001(b)(5)(A) provides that "if the debtor is a corporation, and if the court so designates," the term "debtor" includes "[a]ny or all of its officers, directors, trustees, or members of a similar controlling

5

body." Fed. R. Bankr. P. 9001(b)(5)(A). It may also include controlling stockholders or members, or [a]ny other person in control." Id. See also In re Best Home Performance of CT, LLC, No. 19-20688, 2019 Bankr. LEXIS 3682 at *20 (Bankr. D. Conn. Dec. 2, 2019) ("[T]he underlying purpose of the statute would be thwarted in favor of manipulation and abuse if no one was to have a voice for the corporation."). Under this Rule, the Court finds the Board of Directors to be a suitable designee to represent the Alleged Debtor in this proceeding. The Board thus has standing to contest the petition and prosecute its Motion of behalf of the Alleged Debtor.

### 2. *Community Bank & Trust*

The Petitioning Creditors make the same argument in response to CBT's motion to dismiss, asserting that it does not have standing to contest the petition as the senior secured creditor. CBT has moved for dismissal under 11 U.S.C. § 305(a)(1), which allows a court to abstain and dismiss the proceeding if the dismissal would better serve the interests of creditors and the debtor. "Unlike section 303 and Rule 1011 … section 305(a) … contain[s] no language limiting who may file a motion to dismiss such that any party in interest may file and prosecute such motions." In re Jr. Food Mart, Inc., 234 B.R. 420, 421–22 (Bankr. E.D. Ark. 1999). See also In re Cink, No. 06-40019, 2007 Bankr. LEXIS 649, at *6 (Bankr. S.D. Feb. 21, 2007) ("Any party in interest, including the debtor, may move for dismissal of a case—any chapter—under 11 U.S.C. § 305(a)(1)."); 2 Collier on Bankruptcy ¶ 303.35 (16th ed.

6

2024) ("Section 305 permits any party to seek dismissal."). "Prohibiting a creditor or other party in interest from seeking dismissal of an involuntary case would permit abusive filings without restraint." In re Jr. Food Mart, 234 B.R. at 422. CBT is therefore not precluded from filing or prosecuting its motion to dismiss under section 305(a)(1).

B. "Farmer" Status

Section 303(a) of the Bankruptcy Code provides that an involuntary Chapter 7 case may be commenced "only against a person, except a farmer[.]"[1] "Farmer" is defined in 11 U.S.C. § 101(20) as:

> [A] person that received more than 80 percent of such person's gross income during the taxable year of such person immediately preceding the taxable year of such person during which the case under this title concerning such person was commenced from a farming operation owned or operated by such person.

The term "farming operation" includes "farming, tillage of soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(21). The Court must determine whether more than 80% of Pure Prairie's 2023 Gross Income was derived from a "farming operation."

This case has similarities to In re Dakota Lay'd Eggs, 57 B.R. 648 (Bankr. N.D. 1986). In that case, the alleged debtor was an egg producer. Like Pure Prairie,

---

[1] "Person" includes an individual, partnership, or corporation. 11 U.S.C. § 101(41).

7

the debtor owned flocks of laying hens and contracted with outside farmers, who then provided shelter and the labor necessary for maintaining the chickens. Id. at 650. The debtor provided feed and medication for the animals but was otherwise uninvolved until it picked up and transported the eggs to its processing facility. Id. The court was careful to note that while the legislative history of the relevant Code provisions suggests that the definitions of "farmer" and "farming operation" should be liberally construed, the provisions "cannot be so broadly applied as to bring in operations clearly outside the nature or practices one normally associates with farming." Id. at 653. These definitions were intended to "include those activities normally done by persons engaged in the initial stages of production." Id. The court found that the income derived from the sale of the eggs fell within the definition of "poultry production," and thus constituted income derived from a "farming operation," citing primarily to the fact that the hens were owned by the alleged debtor. Id. at 656.

This case differs from the Dakota Lay'd Eggs case in one important respect, however. Pure Prairie generates only a small portion of its income from the sale of eggs—the vast majority of this income comes from the sale of poultry that has undergone "primary" or "secondary processing." As noted in the Declaration of George Peichel (Doc. 55-3), "primary processing" refers to the process of receiving, staging, slaughtering, scolding, de-feathering, eviscerating, and chilling whole birds

for further packaging and sale. "Secondary processing" can include portioning, deboning, marinating, forming, cooking, and packaging ready-to-eat poultry. The Petitioning Creditors argue that the income derived from the processed poultry products cannot be considered income from a farming operation because the products are no longer in an "unmanufactured state."

### 1. Unmanufactured State

"Unmanufactured" is not defined in section 101, or anywhere else in the Bankruptcy Code. When interpreting a word not defined in the relevant statute, the Court first looks to the word's plain meaning. Perrin v. United States, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). The Oxford English Dictionary defines "unmanufactured" as "[n]ot manufactured; in a raw or unprocessed state or condition." Unmanufactured, Oxford English Dictionary, https://www.oed.com/dictionary/unmanufactured_adj (last updated July 2023). The eggs sold by the Alleged Debtor clearly fit this definition. They may be washed and packaged prior to sale, but they are otherwise raw and unprocessed. The same cannot be said about the chicken products, however. While some of the chicken products produced by the Alleged Debtor may be "raw" when sold, the Court cannot conclude they are "unprocessed" after undergoing what is specifically referred to as primary or secondary processing.

This conclusion and supporting rationale are in accordance with an earlier case before this Court involving a sawmill operation. In re Miller, 122 B.R. 360 (Bankr. N.D. Iowa 1990). In that case, the debtors owned land on which they grew and harvested timber. Id. at 362. After harvesting, the logs were processed in the debtors' sawmill and sold commercially. Id. The debtors argued that this was a "nontraditional farming operation" that should be recognized as such under the Bankruptcy Code. Id. The Court took issue with this "expansive view of farming," stating the following:

> [A]ssuming arguendo, that logging can constitute a farming activity, the operation of a sawmill is one further step removed from that logging activity and is beyond even an expansive view of a farming operation. The definition of a farming operation makes specific reference to the growing and cultivation of farm commodities in their unmanufactured state. The sawing, planing, and drying of lumber to be sold commercially, is clearly a manufacturing activity.

Id. at 365. Much like in Miller, the processing activity here is far removed from the farming aspect and clearly constitutes a manufacturing activity. Any income derived from the sale of those products in their manufactured state thus cannot be considered income from a farming operation.

### 2. Percentage of Gross Income

The Court has not been provided with the specifics of Pure Prairie's income from taxable year 2023, only that "approximately 100% of [Pure Prairie's] gross income was derived from poultry operations" that year. This was also the case in

2024, up until Pure Prairie ceased operations. The Court is left to assume that the 2023 income was derived in substantially the same way as 2024—the majority being derived from manufactured "chicken products." The income statement for January 2024 through October 2024 provides as follows:

| Income | |
|---|---|
| **40000 – Revenue from Operations** | |
| 40005 – Revenue from Chicken Products | $38,368,909.82 |
| 40010 – Revenue – Eggs | $1,247,392.50 |
| 40015 – Revenue – Bi-Products | $3,842.92 |
| 40020 – Discounts | ($227,317.62) |
| 40100 – Freight Revenue | $616,638.38 |
| **Total – 40000 – Revenue from Operations** | **$40,009,466.00** |

Based on these amounts, the Court has calculated that approximately 3.1% of Pure Prairie's income from 2024 came from the sale of unmanufactured farm products (eggs). This is a far cry from the 80% required for it to be classified as a "farmer" for section 303(a) purposes. Because the movants have not shown that at least 80% of Pure Prairie's 2023 income came from the sale of eggs—or other farm products in an "unmanufactured state"—the Court concludes that Pure Prairie is not a "farmer" and may be the subject of an involuntary proceeding.

### C. <u>Abstention</u>

CBT argues that that the Court should abstain and dismiss this case because the pending state court Assignment protects the interests of all parties and provides for an economic and efficient administration of the Alleged Debtor's liquidation. Starting fresh in this involuntary proceeding, it argues, would be costly and time

consuming. In addition, CBT points out that the Alleged Debtor already sought relief in a bankruptcy case and concluded that it was not in its best interest, later moving to dismiss the case. The Petitioning Creditors did not object to dismissal in that case, and the court granted the motion. In opposition, the Petitioning Creditors argue that abstention would be improper in this case for a number of reasons: (1) there is no opportunity for creditors to conduct discovery into claims against the Alleged Debtor; (2) the Minnesota Receivership Statute does not contain rights for the benefit of creditors to the same extent of the Bankruptcy Code; (3) creditors do not have the right to prosecute claims against the Alleged Debtor without leave of the Minnesota Court and additional expense and motion practice; (4) creditors are not sure what assets have been transferred to the Assignee as part of the Assignment; and (5) the Assignment has not proceeded in such a way and to such an extent that prejudice would occur if the case continued in the Bankruptcy Court.

As the parties acknowledge in their respective motions, "[a]bstention is an extraordinary power that should be used only in extraordinary circumstances." Pennino v. Evergreen Presbyterian Ministries (In re Pennino), 299 B.R. 536, 538 (B.A.P. 8th Cir. 2003).[2] This power is governed by section 305 of the Bankruptcy Code, which provides, in relevant part:

---

[2] Courts often avoid application of section 305(a) because the resulting order is not reviewable on appeal. 11 U.S.C. § 305(c).

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
> (1) The interests of creditors and the debtor would be better served by such dismissal or suspension …

11 U.S.C. § 305(a)(1). In determining whether the interests of the parties would be better served by dismissal, courts must focus on the unique facts of each case. See In re Iowa Trust, 135 B.R. 615, 622 (Bankr. N.D. Iowa 1992). "[A] bankruptcy court is not bound by a prescriptive template," and "may consider any factors it deems relevant to the determination." Profutures Special Equity Fund, L.P. v. Spade (In re Spade), 269 B.R. 225, 228 (D. Colo. 2001) (citing In re Iowa Coal Mining Co., 242 B.R. 661, 671 (Bankr. S.D. Iowa 1999)). Courts undertaking this analysis have considered a number of factors, including the following:

1. The economy and efficiency of administration;
2. The availability of another forum, or the actual pendency of an insolvency proceeding in one;
3. The essentiality of federal jurisdiction to a just and equitable resolution;
4. The availability of alternative means for an equitable distribution of assets and value;
5. The lesser cost of a non-bankruptcy process that would serve all interests as well;
6. The possibility that commencing administration in bankruptcy would duplicate previous effort toward a workout in a non-bankruptcy setting; and
7. The purpose for which bankruptcy jurisdiction was sought by the petitioners.

In re NRG Energy, Inc., 294 B.R. 71, 80 (Bankr. D. Minn. 2003) (citing In re Fax Station, Inc., 118 B.R. 176, 177 (Bankr. D. R.I. 1990); In re 801 South Wells St. L.P.,

13

192 B.R. 718, 723 (Bankr. N.D. Ill. 1996); In re Trina Assoc., 128 B.R. 858, 867 (Bankr. E.D. N.Y. 1991)). Notably, after considering these factors, "courts generally dismiss an involuntary case under § 305(a)(1) where the debtor has made an assignment for the benefit of creditors." In re Cincinnati Gear Co., 304 B.R. 784, 785–86 (Bankr. S.D. Ohio 2003) (citing In re Bailey's Beauticians Supply Co., 671 F.2d 1063 (7th Cir. 1982); In re Artists' Outlet, Inc., 25 B.R. 231 (Bankr. D. Mass. 1982); In re M. Egan Co., Inc., 24 B.R. 189 (Bankr. W.D. N.Y. 1982)).[3] Those decisions are bolstered by the legislative history of section 305, which indicates that Congress likely contemplated abstention under similar circumstances:

> [I]f an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case.

H.R. REP. NO. 95-595, 95th Cong. 1st Sess. 325 (1977); S.R. REP. No. 95-989, 95th Cong. 2d Sess. 36 (1978).

The facts of this case align closely with the scenario Congress considered and intended § 305 to address. The Alleged Debtor has executed an assignment for the

---

[3] See also Mike C. Buckley & Gregory Sterling, What Banks Need to Know About ABCs, 120 Banking L.J. 48, 54 (2003) ("Reluctant creditors will find it difficult to attack an [assignment for the benefit of creditors ("ABC")]. Creditors who file an involuntary bankruptcy case after the ABC will usually be faced with a motion by the Assignee or other interested parties to dismiss or abstain from the bankruptcy case on the grounds that the pending ABC is a more than adequate substitute for an involuntary bankruptcy case. Replacing one professional fiduciary with another would generally be a waste of resources and time, and most such involuntary bankruptcies are dismissed, or the bankruptcy court abstains in deference to the existing ABC.").

14

benefit of creditors in Minnesota state court. While not necessarily "recalcitrant," the Petitioning Creditors here are few in number and hold a small fraction of the total claims against Pure Prairie. They argue that bankruptcy better serves the interests in this case because it provides procedural and substantive benefits that would otherwise be unavailable to the creditors in state court. The Court is not persuaded by this argument and finds that abstention is proper in this case for the reasons that follow.

1. *The Assignment adequately protects interests of all parties at a lesser cost.*

The Petitioning Creditors assert that the Assignment does not provide transparency, litigation protections, or jurisdiction for creditors to have their claims adjudicated to the same extent that bankruptcy does. They point out that the Assignment does not provide them with an opportunity to conduct discovery into claims against the Alleged Debtor, that a trustee in bankruptcy would have more expansive powers to pursue claims related to prepetition transfers than the Assignee, and that creditors do not have a right to prosecute claims against the Alleged Debtor without leave of the Minnesota court. While the Court acknowledges this to be the case under the Assignment, it cannot conclude that creditors are prejudiced here merely because they are not afforded exactly the same rights as they would be in bankruptcy or are required to seek leave of court to exercise them. Their interests are still adequately protected by the Assignment for their benefit. Under Minnesota

law, the Assignee represents the creditors, not the Alleged Debtor. Boyum v. Jordan, 146 Minn. 66, 72–73 (1920). In its role, the Assignee has a duty to act in good faith and exercise its due diligence in managing the Assignment assets. See 4 Dunnell Minn. Digest, Assignments for Benefit of Creditors § 2.01 (2024). Part of this duty is an obligation to pursue actions to set aside fraudulent conveyances and unlawful preferences. Minn. Stat. § 577.07. See also Swedish-American Nat'l Bank of Minneapolis v. First Nat'l Bank of Gardner, 89 Minn. 98, 108–09 (1903). If questions arise about the property subject to the Assignment, the creditors may ask the court to order the Assignee to file a schedule of all the assigned property or to conduct appraisals if appropriate. Minn. Stat. § 576.33. The Assignee may also be required to prepare and file interim reports detailing its activities, receipts, disbursements, and other relevant matters. Id. § 576.36. While the Assignee may not have the same powers as a bankruptcy trustee, its powers are expansive enough to protect the creditors in this case without the additional layer of expenses that bankruptcy would entail.

The additional expense of bankruptcy is particularly important to note here. Based on the record before the Court, all of the Alleged Debtor's assets are encumbered and no equity exists in the property. As the United States Trustee noted in the earlier Minnesota proceeding, if the case were to proceed in bankruptcy, the assets would likely be abandoned by the trustee and it would proceed as a no-asset

16

case. Unsecured creditors stand to recover very little, if anything, in any scenario. The expense of bankruptcy would eat away at what already stands to be a measly recovery for all creditors involved.

  *2. Proceeding with this case would serve no real bankruptcy purpose.*

  Involuntary proceedings are intended to serve as a means "to secure an equitable distribution of the assets of the alleged debtor among all his creditors." In re Arker, 6 B.R. 632, 636 (E.D.N.Y. 1980) (citing In re Blount, 142 F. 263 (E.D. Ark. 1906); Pirie v. Chicago Title & Trust Co., 182 U.S. 438 (1901)). "Such a remedy exists as an avenue of relief for the benefit of the overall creditor body … [it] was not intended to redress the special grievances, no matter how legitimate, of particular creditors." In re Brooklyn Resource Recovery, 216 B.R. 470, 486 (Bankr. E.D.N.Y. 1997). As such, involuntary petitions require "a reasonable prospect for some distribution to creditors." Frank R. Kennedy, The Report of the Bankruptcy Commission: The First Five Chapters of the Proposed New Bankruptcy Act, 49 Ind. L.J. 422, 430 (1974). See also Arker, 6 B.R. at 637 ("To grant an order for relief in a case where there are no assets to be liquidated for the benefit of creditors would not be in comport with this long standing policy underlying involuntary proceedings."). This is particularly true in a corporate Chapter 7 case, such as this one. Corporations are not granted a discharge in Chapter 7. 11 U.S.C. § 727(a)(1) ("The court shall grant the debtor a discharge, unless … the debtor is not an individual."). "The limited

purpose of a corporate Chapter 7 case is the fair and orderly liquidation of corporate assets." In re Lang, 398 B.R. 1, 4 (Bankr. N.D. Iowa 2008) (citing In re Int'l Zinc Coatings & Chem. Corp., 355 B.R. 76, 85 (Bankr. N.D. Ill. 2006)). Where there are no assets available for distribution, the case serves no bankruptcy purpose. In re Int'l Zinc Coatings & Chem. Corp, 355 B.R. at 85.

As noted, there will be nothing for the trustee to distribute in this case and little prospect of acquiring funds, even if costly preference and avoidance actions were pursued. This case would thus serve no real purpose except to increase costs and provide the Petitioning Creditors with a forum to pursue potential claims against the Alleged Debtor that may instead be brought in state court.

Based on the totality of the circumstances in this case, the Court finds that the interests of both the Alleged Debtor and its creditors would be better served by abstention under section 305(a)(1).

## IV. Conclusion/Order

IT IS THEREFORE ORDERED:

1. Pursuant to 11 U.S.C. § 305(a), this Court abstains from exercising jurisdiction over this case, which is hereby **DISMISSED**.
2. The alternate motions for dismissal are **DENIED**, as moot.
3. The alternate motions for relief from the automatic stay are **DENIED**, as moot.

Ordered:
February 5, 2025

Thad J. Collins
Chief Bankruptcy Judge